UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MICHAEL D. WESLEY,

                              Plaintiff,


            -against-                                          05 Civ. 5833 (LAK)


THE CITY OF NEW YORK, ET AL.,

                              Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


            Appearances:


                        Michael D. Wesley
                        *Plaintiff* Pro Se


                        Martin J. Bowe, Jr.
                        Assistant Corporation Counsel
                        MICHAEL A. CARDOZO
                        CORPORATION COUNSEL OF THE CITY OF NEW YORK
                        *Attorneys for Defendants*


LEWIS A. KAPLAN, *District Judge.*

            The New York City Department of Correction ("DOC") houses thousands of prisoners

at Rikers Island.   Beginning years ago, it began implementing a religious meals program to

accommodate the religious dietary requirements of Muslim and other prisoners, ultimately spending

about $200 million to do so.

            Plaintiff Michael D. Wesley, a some-time inmate of correctional facilities on Rikers

Island and a self-identified Muslim, claims, among other things, that the manner in which the DOC

2

provided Halal food – that is, food prepared in accordance with what DOC understands to be the tenets of Islam – violated Wesley's First and Fourteenth Amendment right to free exercise of his religion as well as his rights under the Religious Land Use and Incarcerated Persons Act ("RLUIPA")[1] because the food did not meet Wesley's interpretation of Halal.   The case was tried without a jury.  These are the Court's findings of fact and conclusions of law.

## *Prior Proceedings*

The starting point for discussion is the magistrate judge's extensive and thorough report and recommendation granting in part and denying in part the defendants' motion for summary judgment dismissing the complaint (the "R&R"),[2] which the Court adopted on July 19, 2010.[3]   When the case proceeded to trial, plaintiff's only remaining claim was that the City of New York and four individual defendants violated his rights by "the cleaning of Halal and general-population food-preparation and service equipment together."[4]   This claim depended upon the assertions that (1) the commissaries available to inmates in the Rikers Island institutions during the relevant period sold products that were haraam, meaning that they were not Halal; (2) some inmates placed such products on trays used for serving Halal meals to inmates requesting them; (3) this "contaminated" those trays

---

[1]

   42 U.S.C. § 2000cc *et seq.*

[2]

   DI 184.

[3]

   DI 189.

[4]

   DI 184, at 87. Plaintiff's state and local law claims were not addressed at trial.  As noted in the R&R, "[t]o the extent that plaintiff's federal claims should be dismissed, . . . the substantially mirror-image state and municipal claims should meet the same fate." *Id.* at 86 (citing *Salahuddin v. Mead*, 2000 WL 335552, at *2-3 (S.D.N.Y. Mar. 30, 3000); *Holman v. Goord*, 12 Misc. 3d 1174(A), 820 N.Y.S.2d 843 (Sup. Ct. Sullivan Co. 2006)).

3

in a manner that made it impossible for plaintiff, consistent with his religious beliefs, to eat food served on those trays and thus substantially burdened the free exercise of his religion; and (4) the DOC practice of washing those supposedly Halal trays in a commercial dish washing machine used contemporaneously to wash non-Halal meal trays not only did not eliminate, and indeed aggravated, the "contamination" of those trays.

In order for plaintiff to prevail on his First Amendment claim, he was obliged to "show at the threshold that the disputed conduct substantially burden[ed] his sincerely held religious beliefs."[5] Assuming he sustained that burden, "the court evaluates the reasonableness of the challenged act or policy under a four-factor test."[6]  These considerations include "whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests."[7]

RLUIPA is more demanding of the government.  As Magistrate Judge Dolinger put it, the statute

> "provides that the 'government shall not "impose a substantial burden" on the "religious exercise" of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means.' *Salahuddin*, 467 F.3d at 273 (quoting RLUIPA, 42 U.S.C. § 2000cc-1(a)). Once an inmate demonstrates the imposition of a substantial burden on his or her religious exercise, the government bears the burden of demonstrating the furtherance of a

---

[5]

*Id.* at 19 (citing *Salahuddin v. Goord*, 467 F.3d 263, 274-75 (2d Cir. 2006)).

[6]

*Id.* at 21.

[7]

*Id.* (citing *Salahuddin*, 467 F.3d at 274).

4

compelling interest by the least restrictive means. *Jova*, 582 F.3d at 415."[8]
In this Circuit, "'safety and security concerns "are undisputedly compelling state interests"', but . . .
the government must establish in a non-conclusory manner that the particular policy at issue actually
furthers those interests."[9] Satisfaction of the "least restrictive means" test requires that the government
"actually [have] considered and rejected the efficacy of less restrictive measures before adopting the
challenged practice."[10]

### Discussion

The Court assumes, without so finding, that plaintiff's beliefs with respect to the
"contamination" of the Halal trays by virtue of the placement of the haraam commissary items on them
and the washing of those trays in a dishwasher used also for non-Halal meal trays are sincerely held
and religious.  In light of the discussion in *Ford v. McGinnis*,[11] the Court further assumes, again
without so finding, that the DOC practices placed a substantial burden on the free exercise of
plaintiff's religion.[12]  That brings us to the question of whether the City established that the burden on
plaintiff's free exercise was justified.

On this question, the City is materially helped by plaintiff's acknowledgment during

---

[8]

*Id.* at 59.

[9]

*Id.*

[10]

*Id.* (quoting *Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009)).

[11]

352 F.3d 582, 591-94 (2d Cir. 2003).

[12]

The fact that plaintiff's views in this respect appear unique or at least rare among prisoners
participating in the Halal food program at Rikers Island is relevant but not dispositive of this
question.  *See id.* at 593.

trial that, in his view, "every single piece of halal food served at Rikers Island is non halal," or "[c]ontaminated."[13]  He stated that his needs would not have been accommodated even if his meals had been served on disposable trays.[14]  The only course open to the City that would have been consistent with the free exercise of his religion, he said, would have been to provide him with "halal sealed meal[s]" prepared in outside facilities meeting his requirements.[15]  While he did not so state, the logical implication of his position is that his religious requirements would have been met also by a complete redesign and reconstruction of the food service facilities on Rikers Island to provide entirely separate facilities for the preparation and service of food satisfying his own definition of Halal.

In examining these alternatives to the present food service system, it must be borne in mind that there were, on average, some 5,700 inmates on Rikers Island who requested Halal food during 2002 through 2005, the years in question.[16]  The DOC provided each of these inmates three meals a day, for a total of approximately 17,100 Halal meals per day.  The DOC assistant commissioner of nutritional services, Paulette Johnson, testified that the City, before embarking years ago on its own religious meals program, issued a request for proposals to supply prepackaged Halal

---

[13]     DI 208, Ex. B, Trial Transcript ("Tr.") at 128.

Plaintiff apparently came to this view when he learned, during the trial, that the pans in which Halal and non-Halal food are cooked both go through the same dish washer.  *Id.* at 126-28.

[14]     *Id.* at 128-29.

[15]     *Id.*

[16]     *Id.* at 106-07.

meals,[17] but was unable to find any vendor that could supply the volume and variety of Halal meals that the DOC required.[18]  Ms. Johnson has remained well informed about the availability or non-availability of such options and stated that she is unaware of any vendor who could have supplied the DOC prepackaged Halal meals during the relevant period or even today.[19]  The Court credits that testimony[20] and finds that serving prepackaged Halal meals to the members of the Rikers Island population desiring Halal food was and is not an option practically available to the City.[21]

So we are left with two possibilities, neither precisely argued by the plaintiff.  The first is that DOC was obliged to provide him with food prepared off-site in circumstances meeting his preference while maintaining its own program for the overwhelming majority of inmates who requested Halal food but raised no objections to the manner in which DOC provided them.  The second is that DOC should have scrapped its religious meal program in favor of instituting a new

---

[17]

     The Court infers from the consideration of the use of an outside vendor and the large expenditure the City made to implement the religious meals program that it actually considered all reasonably foreseeable alternative means of providing for prisoners' religious dietary needs.

[18]

     *Id.* at 83-84.

[19]

     *Id.* at 84-86.

[20]

     This is not to be taken as acceptance of her estimate that it would have cost $89 million to have provided prepackaged Kosher meals to Muslim inmates during the relevant period (*see id.* at 93-94, 123-25) or that it would have cost $147 million to change to disposable trays for the service of Halal meals (*id.* at 91-93).  The Court ascribes no dishonesty to this well intentioned and doubtless capable witness, but her testimony on these points was not persuasive for reasons abundantly clear in the transcript.

[21]

     This is so despite the ongoing provision of prepackaged meals to inmates desiring Kosher food. The DOC was able to find a vendor who would provide Kosher sealed meals, and does not currently provide any Kosher meals prepared at Rikers Island.  Testimony indicated also that this was due to the smaller number of inmates seeking Kosher meals (as compared to Halal), and the DOC's inability to conform the preparation facilities to Kosher requirements. *See id.* at 109, 112.

system of food preparation at Rikers Island  that would have satisfied plaintiff and, at the same time, served the same food to all other Halal-requesting inmates despite the fact that almost none of them expressed similar wishes.

The DOC was or would have been justified in rejecting the first of these options – providing plaintiff alone or a handful of inmates with food prepared by an outside vendor that met their personal definitions of Halal.[22]  The provision of meals prepared to suit the particular wishes of very small groups of inmates would be extremely burdensome in an institution serving thousands of meals per day.  Moreover, the provision of individualized food service options likely would be disruptive in a prison environment.  Just as some airline passengers presumably have requested special meals because the passengers preferred them to standard fare and not for any religious or medical reason, some inmates at Rikers Island likely would act in a comparable manner.  Indeed, that was borne out in Ms. Johnson's experience.  She identified prior instances when some prisoners who had requested Halal meals as a general matter instead ate pork chops (which are not Halal) when they were served for non-Halal inmates, thus causing the food service to run short of food for the non-Halal

---

[22] There is no persuasive evidence that plaintiff ever so requested, as distinguished from complaining about the practice of other inmates putting non-Halal commissary items on trays designated for Halal foods and/or the availability of products containing pork in the prison commissaries.  *See* DI 6, at 3 (amended complaint noting plaintiff wrote a grievance while in prison only about why the prison commissary was "allow[ed] to Sell Pork or Pork [by] Product").  Although it is not in the trial record, plaintiff provided also a copy of a letter he sent to DOC and others dated November 21, 2005 requesting food be served to him on disposable trays.  DI 208, at 28.  For reasons already noted above, however, plaintiff indicated at trial that disposable trays would not have eliminated the contamination he alleges existed in the food he was served.  Moreover, the Court finds that the DOC could not reasonably have foreseen that the current religious meals program, which in the main serves the needs of Muslim inmates, would not meet the needs of a very small number of Muslims who might share Mr. Wesley's view of the Halal requirements.  *See* Tr. at 98 (Ms. Johnson consulted with an Imam regarding the methods for preparation for Halal food at Rikers Island, and he "said it [i.e., DOC's practices] was acceptable").

8

prisoners, leading to some unrest and security concern.[23]  Accordingly, the Court credits her testimony that it is difficult to plan meal service and reliably satisfy demand when prisoners may cross from one menu to another out of personal taste for what is being served on a given day to one part of the population but not another.  And this leads to the inference that the provision of meals to suit the particular wishes of individual or small numbers of inmates, even to satisfy sincerely held religious beliefs, would lead to a proliferation of demands for special food options, many of which would be grounded in personal preference rather than in any religious concern.  The burdens likely would be excessive and their avoidance serves a legitimate and rational governmental objective.

The second alternative – modifying the religious meal program at Rikers by building entirely separate facilities for the preparation and service of food meeting plaintiff's personal definition of Halal – requires little additional discussion.  While neither party offered evidence at trial regarding the cost of such a change, an estimate may be inferred from the fact that the City spent about $200 million to set up the religious meals program that it currently operates at Rikers Island.[24] Ultimately, however, whether a system of entirely separate food preparation would cost $200 million, $100 million, $50 million, or some lesser figure would not matter.  For reasons already discussed, avoiding that additional burden serves a legitimate governmental interest, as cost is an appropriate consideration in these circumstances.[25]  But we deal here with a situation in which Rikers Island has

---

[23]

DOC no longer serves pork chops.  *See* Tr. at 97.

[24]

*Id*. at 83-84.

[25]

*See McGinnis*, 352 F.3d at 595 (noting in First Amendment context that "the court should consider [*inter alia*] whether available, low-cost alternatives exist that would accommodate the right without compromising valid penological interests" (citing *Turner v. Safley*, 482 U.S. 78, (1987)); *Salahuddin*, 467 F.3d at 274 (applying same standard from *Turner* in RLUIPA context).

9

had a substantial Muslim population for many years.  The food service program was designed to meet that population's beliefs and desires.[26]  Yet, with the exception of plaintiff and a handful of others, no one has advanced the unique complaints made here.  The City's interest in avoiding an added expense in the millions, tens of millions or even more to remedy a situation that, so far as the record discloses, has troubled almost no one is entitled to substantial weight.

Of course, the fact that it would be burdensome or costly to the City to satisfy plaintiff's unusual personal requirements might not alone carry the day if the failure to satisfy them precluded altogether the appropriate exercise of his religious beliefs.  But that is not the case here. Plaintiff testified that he was able to obtain sufficient food to eat without violating his religious beliefs.[27]  In light of that fact, the burdens of adopting a means of providing Halal food different than the one currently in place more than justify the City's position.

*Conclusion*

Everyone is entitled to his or her own views as to spiritual matters.  No one's religious beliefs may be deemed correct or incorrect because they correspond or do not correspond to those of other members of a particular religion.  But neither the Constitution nor RLUIPA requires that jails and prisons accommodate each and every set of dietary requirements, even where sincerely held, regardless of cost and regardless of the prevalence of such requirements in the relevant population. The DOC policies and practices in respect of the matters at issue in this case were reasonable as

---

[26]

    Ms. Johnson testified that the Halal program at Rikers Island had undergone "substantial changes" in the last two decades at the cost of more than $200 million.  Tr. at 83-85.  The Court is mindful of the expense incurred by the DOC in implementing its Halal food program, and commends its efforts in creating such a program.

[27]

    *Id*. 43-46.

10

measured by the *Salahuddin* standard.  They sufficiently furthered by appropriately tailored means compelling governmental interests within the meaning of RLUIPA.

The action is dismissed.

SO ORDERED.

Dated:          August 10, 2012

_____

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)